This action is to recover damages for the loss of an eye and other injuries caused, as the plaintiff alleges, by the negligence of the defendant in a failing to furnish him a safe place to work, and in not providing a shield to protect him from brass chips falling from a boring mill.
The defendant denies negligence and alleges that the injury to the plaintiff was an accident, or that it was caused by his contributory negligence, or was the result of one of those risks assumed as a part of his employment.
All of the evidence is not set out, but enough to consider the motion of the defendant for judgment of nonsuit.
J. E. Pritchett, the plaintiff, testified: "I am the plaintiff. I am 31 years old. Am a machinist."
Here the defendant admitted that the plaintiff was in its employment as a machinist in its machine shops at Spencer, North Carolina, at the time he was injured.
"I have served my apprenticeship and have been working at my trade as machinist for fifteen or sixteen years. I was employed by the Southern Railway Company in its machine shop at Spencer, beginning work on 20 June, 1910. I reported for work, and my first work was on the rod job on the eastern side of the shops. After I had been at work on the rod job three-quarters of an hour that afternoon, Mr. Daniels, defendant's shop foreman, came and told me that they were behind on the driving-box job, and that he wanted me to assist in the driving-box job in the place of the regular man, who was sick. Shop Foreman Daniels took me over there to the driving-box space, and introduced (92) me to Foreman Hege, who was in charge of the driving-box shop that afternoon. Foreman Hege then laid off some oil grooves with chalk on some driving boxes in the driving-box space, for me to chip. I then went to work on these oil grooves, when I was instantly struck blind by something striking me in the eye. I had no warning of where it came from. Mr. Caver then took me in his arms. I could not see him, but I recognized him by his voice. Quite a number of men gathered round me, as I could tell by their voices. I do not know who pulled the brass out of my eye, but I am told that Foreman Daniels did it. This driving-box job space is 10 x 15 feet, and is located northwest of the rod-job space where I had been working. That driving box they put me to work on weighed from 500 to 700 pounds. Those driving boxes had been placed in that driving-box space before I got to that space. I did not help place them. I had chipped grooves on two or three of those driving boxes before I was hurt. The driving-box on which I was ordered to work was about 10 or 12 feet from a boring *Page 73 
mill. At the time of my injury I was about 10 or 12 feet in a northerly direction from that boring mill. I was facing towards the boring mill, with my right eye exposed to said boring mill. I had never worked in this driving-box space before. The boring mill was not in operation, but was idle, when I was carried there. The last time I noticed that boring mill was possibly a minute or a couple of minutes before I was hurt; and it was then idle. It was not running. When struck I was in a stooping position, the driving box in front of me. I had my air hammer in my right hand and my left hand over the barrel of it. At the moment I was struck, as well as my recollection serves me, I was trying to get control of this air throttle on the hammer. It was very stiff and would not work. When I first took hold of this hammer, I called Mr. Hege's attention to it, stating to him about the spring being very stiff. He said that spring is too rigid and stiff, and the way we control it is we have to put our finger on it and push it and work with the right hand. My best recollection is that at the time I was struck I had cramped my finger trying to get control of the hammer."
The defendant objected to the witness testifying as to the defective condition of the air hammer, on the ground that there was no allegation in the complaint of any defect in the air hammer. The (93) objection was overruled, and the defendant excepted.
"When I was first struck by the chip, it was like a man being shot. It dazed me; but I threw my hands up immediately to my eye to hold it apart, as it burned like fire. The brass chip went in the center of my eye, or very close to the center of it.
"I was facing the direction of the boring mill with my right eye exposed. It become necessary for a man to be standing like I was. Certainly a man could twist, wrestle, and pull one of those driving boxes around, and his back would be towards the boring mill, if he desired to do so. I could not have got help to move that driving box, as help was scarce."
C. S. Carver testified as follows: "I am a machinist. Have been a machinist twelve years. I was working for defendant at Spencer the day Pritchett was hurt. I had been keying up some brass. I was 35 or 40 feet from Pritchett. This boring mill was on a line with him and me, and I could see both Pritchett and the boring mill at the same time. I was watching Pritchett at the time he was hurt and was the first man to get to him. I was watching him at the moment he was hurt. At that moment he was sitting down looking at his hammer. There was no chisel in it. I looked at him to see what he was doing. He was looking at his hammer. He had his throttle in his right hand and end of barrel in his left hand. No chisel was in his hammer at the time *Page 74 
he threw his hand to right eye. Pritchett was facing the boring mill in a northeast direction with his right eye more exposed to the boring mill. Up to one minute before he was injured, the boring mill was not in operation. I saw defendant's apprentice boy, Kizziah, walk up to the boring mill and start it. I do not think the boring mill made more than two or three revolutions before Pritchett was hurt. That boring mill makes about 50 or 60 revolutions per minute. Pritchett was injured possibly 30 seconds after Kizziah started the boring mill. A piece of brass entered his eye near the center, and was taken out by Daniels about two minutes thereafter. I got to him in several seconds after (94) he was hurt, as soon as I could run to him. He was holding his right eye open with his hands, and said he was blind. The boring mill was still in operation when I got to where Pritchett was hurt and the cuttings still flying. They will fly 120 degrees in a circular bed. Most of them go to the northwest. At the time I went to catch Pritchett those cuttings were flying so that they could hit me. There was no shield between his driving-box space and that boring mill. Pritchett was facing towards the boring mill when hurt. When the brass cutting hit him he dropped his hammer and staggered back. When I got to Pritchett the boy had not shut off the boring mill, and the cuttings were still flying to him. That shield protects the driving-box space to some extent, but not enough to where he was standing. It does not protect where he was standing, but the other side. I worked in the machine shops at Rocky Mount, N.C. Waycross, Ga., two machine shops on the C. and O., Richmond, Va., and Huntington, W. Va., and American Locomotive Works, where boring mills are used like defendant's at Spencer; and I have been through and observed ten or fifteen more shops where boring mills are used. Some shops have sheet-iron shields, some have bags, but in those shops canvas shields are most in general use as a precaution to protect the employees from brass cuttings that fly from such boring mills. It was the custom for those shields to be placed between the operator, wherever the operator might be at work, and the boring mill. Some have two shields, some are V-shape to come around the mill. Those safety shields that were in general use around machine shops of such kind were 6 or 8 feet square, on racks, with canvas backs tacked around them. Such a shield costs $2. If one of these shields had been placed between that boring mill and the driving-box space, it would have provided protection and safety to employees working within the zone of the cuttings that flew from that boring mill. Such a shield would not have interfered with the efficiency of any of defendant's machinery or hindered any of its employees. Defendant worked men in that driving-box space every day, and kept a man operating the boring mill pretty much all the time. Plaintiff's eye just after it *Page 75 
was struck looked like it had been burned. That cutting was (95) hot when it went in and his eye turned white. The kind of cuttings from the boring mill depend upon how the tools are ground, how much feed you have, how much cutting you have, and upon how deep the cuttings are you are taking. Cuttings from boring mill are hot. Cuttings from air hammer are cold on account of lack of friction. There was no shield between the driving-box space and that boring mill when Pritchett was hurt. In these machine shops it is customary to shield these boring mills with canvas shields. That is the proper kind of shield and answers the purpose. Yes, if defendant had had that kind of shield there the day Pritchett was hurt, and had had it large enough to come around the boring mill, it would have been the proper kind. Apparently plaintiff was looking down at the moment he was hurt. I could not see his eyeball."
J. B. Donovant testified as follows: "Am a machinist at Spencer. I was working for Southern Railway Company in June, 1910, about 25 or 30 feet from where plaintiff was when he was injured. I did not see him at the time he was injured. Have operated this boring mill some thing like three and a half years. Cannot tell whether the boring mill is in the same condition now as it was then. I saw that boring mill during June, 1910. There has been no change in that mill that I know of since I worked it. It is the same mill. When I worked it, it would throw brass, I would say, a little over a quarter of a circle of the machine. That is, you would get 10 feet from the machine and they would go 10 feet. At the time I operated it, it would throw shavings in the same portion of the driving-box space where plaintiff was working. It is the general custom for the men to move around the boring mill in chipping it."
W. P. Neister testified as follows: I have been working as a machinist for defendant at Spencer nine or ten years. To my personal knowledge, that boring mill is located now where it has been for three or four years; so has also the driving-box space been located in the same place for the past four years. I do not remember any alterations prior to time Pritchett was hurt. I worked 30 or 40 feet from that boring mill. I have observed it. Every few minutes I was looking in that direction and often passed there. It was the same boring mill three or four years ago, as far as I know, without any change. During (96) that time I have seen it throwing off brass cuttings, before Pritchett was hurt. It would throw the biggest majority of the brass shavings in a northwesterly direction, but they did not all go that direction. The rest would go north and possibly to the northeast, slightly. I did not see the driving box Pritchett was working on when hurt, to recognize it; but I have been pointed out the place and I know where *Page 76 
the driving box was when he was hurt, and I have heard witnesses to-day describe where he was; and from where the witnesses say Pritchett was at the time he was injured, he was in the zone of those flying shavings at the time he was hurt, according to my knowledge and honest belief. There was no shield between this driving-box space and the boring mill the day Pritchett was hurt. It was customary for defendant to work employees throughout the day in this driving-box job space. I operated the boring mill in March or April, 1910. At that time, using the same right hand head, it scattered cuttings quite a good bit in the space where Pritchett occupied, in the lower end of the driving-box space."
I. N. Ayers testified as follows: "I have been a machinist for thirteen years. Was working for defendant in June, 1910, when plaintiff was hurt. I was 25 or 30 feet from where plaintiff was working. I have seen that boring mill throw brass before Pritchett was hurt. I had been working there twelve months before Pritchett was hurt. The boring mill would throw brass about a quarter circle of the boring mill. I think the boring mill would throw brass clippings where Pritchett was. During those twelve months Foreman Daniels would pass that driving-box space about fifty times a day while that boring mill was in operation."
J. F. Perkinson testified as follows: "I am working for defendant, and I was working for it as a machinist at Spencer in June, 1910, and about 30 feet from where plaintiff was hurt. Did not see plaintiff when he was hurt. I had been working in those shops about ten months prior to the time plaintiff was hurt. During that time I had seen that boring mill in operation every day. The tool has something to do with where the cuttings are thrown from (97) that boring mill. You can place a tool so that it will throw them in almost any direction. If you are using the head spoken of this morning, the biggest portion of the cuttings would go in a northwesterly direction. This boring mill would usually throw part of its brass cuttings to where Pritchett was when he was hurt. I do not know that there was a screen out there. I did not see one that day. A screen in the northwest direction would catch part of those shavings, but not all. They will fly in every direction. The biggest portion of them will go in a northwest direction; but you cannot tell where the other shavings are going to fly. They scatter in every direction."
C. S. Flood testified as follows: "I am a machinist. I was working for defendant at Spencer last June, about 30 feet from where plaintiff was when he was hurt. Before Pritchett was hurt I worked in the driving-box space where plaintiff was hurt. When I worked in that driving-box space a couple of days before Pritchett was injured, they had a tool on the boring mill exactly like the one and shaped like the one they were using when Pritchett was hurt; and it then threw cuttings to *Page 77 
the place where Pritchett was hurt. I have had experience in five or six machine shops of this kind where boring mills are generally used; American Locomotive Works, Pennsylvania Railway at Baltimore, S. A. L. at Waycross, Ga., A. C. L. at Rocky Mount, N.C. at Pittsburg, etc., and have had observations in others. The general custom of all machine shops is to have this canvas screen to protect the boring mills to keep the cuttings off of the men. I did not see such screen there the day Pritchett was hurt. The cuttings from the boring mill were hot because of the friction. The hammer would throw cold cuttings. Pritchett's eye was inflamed and looked like a white blister hanging on his eye."
The defendant offered evidence tending to establish the following facts:
(1) That the danger from chips was northwest from the boring mill, and that it had a shield there.
(2) That a shield was unnecessary between the boring mill and the driving-box space. (98)
(3) That the plaintiff could perform the work assigned to him with his back to the boring mill, and that he unnecessarily exposed himself to danger.
(4) That in the position of the plaintiff's head at the time he was stricken, a chip from the boring mill could not enter his eye without striking some object and rebounding, and that therefore that plaintiff was accidentally injured.
(5) That the chip which entered the plaintiff's eye came from the hammer he was using, and not from the boring mill.
The evidence as to damages is not stated, as there is no exception in regard thereto.
The defendant excepted to rulings of his Honor on the evidence:
1. For that the court permitted the plaintiff to testify about the defecive [defective] condition of the air hammer.
2. For that the court permitted the plaintiff to testify that he would have completed his job upon which he was at work within one and one-half minutes.
3. For that the court permitted the plaintiff to testify that the Shop Foreman Daniels told him a man was disabled or sick or out, and they were behind on the job and that they were in a hurry.
4. For that the court permitted witness J. P. Donovant to testify that when he operated the boring mill three and a half years prior to the accident, that at that time it threw chippings in that driving-box space.
5. For that the court permitted the witness J. P. Donovant to testify that when he worked in the driving box space 4 or 5 feet east of the steel column, the boring mill threw cuttings on witness's hand and in his face. *Page 78 
6. For that the court permitted I. N. Ayers, plaintiff's witness, to testify that he was standing 25 or 30 feet beyond where plaintiff was working, and that the boring mill threw brass cuttings where he was standing.
7. For that the court permitted C. S. Flood to testify that a couple of days prior to the injury of the plaintiff he was working in the driving-box space northeast, more than east from the boring mill, (99) and that it threw brass cuttings where he was.
There was a motion to nonsuit, which was overruled, and defendant excepted.
The jury returned the following verdict:
1st. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: Yes.
2d. Was the plaintiff's injury caused by his own contributory negligence, as alleged in the answer? No.
3d. What damages, if any, is the plaintiff entitled to recover? Answer: $5,500.
Judgment was rendered thereon, and defendant excepted and appealed.
After stating the case: There is no error in the rulings on the evidence.
The defendant alleges in its answer that the chip which entered the eye of the plaintiff came from the hammer he was using, and it was competent, for the purpose of meeting this contention, to show that on account of the condition of the hammer the plaintiff was not striking with it at the time he was injured. The evidence that the plaintiff would have completed his job upon which he was at work within one and a half minutes is of little importance, but is relevant to the injury. The plaintiff testified that the boring mill was not in operation when he began to work, and that the chip entered his eye almost instantly, and it was proper for the jury to have before them the length of time he would be engaged at work, in determining whether his conduct was negligent.
If the boring mill was not in operation, and he could complete his job in two minutes, the jury might say it was not imprudent to work with his face to the mill, and that he ought to have taken greater precautions for his safety if required to remain longer.
What the foreman said as he directed him to do the work, (100) and evidence that the boring mill had thrown chips in the driving-box space before the day of the injury to the plaintiff, were properly admitted. *Page 79 
The burden was on the plaintiff to prove that the place where he was at work was unsafe, and that the defendant knew it to be so, or that it could have discovered it by the exercise of ordinary care (Hudson v. R. R.,104 N.C. 491; Nelson v. Tobacco Co., 144 N.C. 420; Blevins v. Cotton Mills,150 N.C. 499), and evidence that a condition has existed for a long time is evidence of knowledge. Cotton v. Mfg. Co. 142 N.C. 531; Cotton v. R.R., 149 N.C. 227.
There are several assignments of error to the refusal to give certain special instructions, all of which, we think, were covered by the charge, but if not, they could not be ground for a new trial on this record.
At the close of the evidence, at 5 o'clock p. m., the judge adjourned court until 9 o'clock next morning. Upon the opening of court next morning plaintiff tendered in writing his prayers for instructions, duly signed by his counsel. Counsel for defendant tendered in writing prayers for instructions, but which were not signed.
After the court had given to the jury the general charge, and while the court was reading to the jury the plaintiff's prayers for instruction, defendant's counsel signed the prayers which it had tendered unsigned as a foresaid, and handed them to the court. The court then read defendant's said prayers numbered 1, 2, 7, 9, and 11. The court did not give defendant's other prayers except as contained in the court's general charge to the jury.
The statute (Rev., sec. 538) is imperative that counsel must sign prayers for special instructions, and that upon failure to do so the judge may disregard them, and the judge need not put his refusal of the instructions on the ground that they were asked too late. As was said by the present Chief Justice in Posey v. Patton, 109 N.C. 457, "The law does that."
That the instructions were not presented in apt time when signed and finally handed up, after the argument closed and the charge concluded, is well settled.
In Craddock v. Barnes, 142 N.C. 92, it was held that prayers for instructions in due form ought to be considered, if requested (101) before the argument begins, and Justice Walker there says: "The time within which instructions should be requested must be left to the sound discretion of the court, as in the case of many other matters of mere practice or procedure, and we will be slow to review or interfere with the exercise of that discretion; but the presiding judge should, and we are sure he always will, so order his discretion as to afford counsel a reasonable time to prepare and present their prayers. Counsel should perform this duty to their clients seasonably and with a proper regard for the right of the trial judge to require that he should have reasonably sufficient time to write his charge and to consider the prayers for special *Page 80 
instructions; and what time is required by each must be determined by the nature and exigencies of each case."
In Biggs v. Gurganus, 152 N.C. 176, the question is again considered, and Justice Brown cites with approval Craddock v. Barnes, supra, and says: "It is well settled that special instructions must be in writing and handed up before argument commences."
The question remaining is the refusal of the motion to nonsuit, and this involves the consideration of the duty which the defendant owed to the plaintiff, and whether the evidence, viewed in the light most favorable to the plaintiff, shows a breach of that duty, causing his injury.
In all courts where the common law is administered it is held that one cannot recover damages upon proof of negligence alone, and that he must proceed further and show that the negligence of which he complains was the real proximate cause of his injury. He cannot recover because a place where employees work is dangerous, unless he was injured by the unsafe place. He cannot say, There was an unsafe place in the shop where I was working, and while it is true I was not working at that place, I fell in another part of the shop and broke my leg, and therefore ask for damages.
The counsel in this case do not contend otherwise, but the difficulty arises in the application of the rule.
"We have repeatedly decided that an employer of labor is (102) required to provide for his employees a reasonably safe place to work." House v. R. R., 152 N.C. 398, and "it is accepted law in North Carolina that an employer of labor to assist in the operation of railways, mills, and other plants where the machinery is more or less complicated, and more especially when driven by mechanical power, is required to provide for his employees, in the exercise of proper care, a reasonably safe place, and to supply them with machinery, implements, and appliances reasonably safe and suitable for the work in which they are engaged, and such as are approved and in general use in plants and places of like kind." (Hicks v. Manufacturing Co., 138 N.C. 325), and "the duty of providing a reasonably safe place in which to work is one of the primary or absolute duties of the master; and when the master delegates the discharge of such duty to a servant, he represents the master, and the latter will be held responsible for the manner in which the duty is discharged." Shives v. Cotton Mills, 151 N.C. 293.
The relative duties of the employer and employee, and the doctrine of contributory negligence and assumption of risk, as applied to the conduct of the employee, are well stated by Justice Hoke in Pressly v. Yarn Mills,138 N.C. 416, in which he says: "It is suggested that if a negligent failure to furnish a shifter is declared to be the proximate cause of the injury on the part of the employer, by that same token *Page 81 
the employee, working on when aware of the defect, is also negligent, and such negligence should be held to be concurrent, and to hold otherwise would require the master to take more care of the servant than the servant takes care of himself. This position finds support in some of the decided cases, but the Court does not think it is in accord with the better considered adjudications on the subject. The position had its origin in some of the older decisions, rendered when the employment of labor was much more restricted and the implements and appliances were comparatively simple and attended with little danger. At that time it was considered of little consequence that the employee assumed, and as matter he assumed the risk of almost everything that happened to him. As business enterprises, however, were enlarged, and machinery became more complicated, and larger numbers of men were being employed in its operation, it was found that the position here (103) contended for was not a proper one by which to determine the relative rights and duties of employer and employee in regard to defective machinery and appliances. It was based upon an entirely erroneous conception, that there was a perfect equality of position between the two in respect to such defective appliances; but nothing is further from the fact, and for the reason, chiefly, that the employer controls the conditions in which the employees do their work. His duty to furnish machinery and appliances reasonably safe and suitable, such as are approved and in general use, in the exercise of a reasonable care, is absolute. As a rule, he buys the machinery from the manufacturer or dealers, who are experts, and can change when he desires; he selects and employs a superintendent and skilled labor, and has the time and opportunity to inform himself as to the character of the machinery he buys and the hazards incident to its use, and, accordingly, the principle which holds the employee to an equality of obligation and responsibility in the respect suggested is unsound and unjust and has been rejected in the more recent and better considered cases."
Negligence is the failure to perform a duty imposed by law. It is the failure to exercise that care which a man of ordinary prudence would have exercised under existing circumstances; and where conditions change, the degree of care required changes with them.
In former days, tools were simple, and the mechanic and his tools were inseparable. He used them daily, and by use became familiar with their qualities, and the dangers incident to his employment, and there was less reason for holding the employer to a high degree of care than now, when complicated machinery, selected by the employer, is used, and when the employee is practically separated from his tools.
There are also in large shops, where many machines are in operation, as in the one where the plaintiff was working, dangers that are not *Page 82 
traceable to any particular machine, but are incident to the business. These cannot generally be made the basis of a cause of action, but the knowledge that they exist imposes upon the employer the duty of (104) exercising greater care.
Applying these principles, there was no error in denying the motion to nonsuit.
There was evidence that the plaintiff was employed on the day of his injury; that he had not, before this, seen the place where he was required to work; that when he began to work, the boring mill was not in operation; that there was much noise in the shop from machines; that it was necessary for him to face the boring mill in the performance of his duty; that as he began to work, the boring mill, which was boring brass, started and a brass chip struck him in the eye; that he was not using the hammer at that time; that chips from the boring mill are hot and those from the hammer cold; that his eye was blistered; that the chip taken from the eye was from the boring mill; that the boring mill was throwing chips in the space where he was working; that the boring mill had thrown chips into this place where employees were required to work several years; that shields around boring mills were in general use, and that they were movable and should be placed between the mill and the employee; that there was no shield between the mill and the plaintiff, and that if one had been there he would not have been injured.
There was much evidence to the contrary, but, on a motion to nonsuit, the law requires us to accept as true those facts which the evidence tends to prove, and we therefore hold that there was evidence of negligence on the part of the defendant which was the direct cause of the plaintiff's injuries.
There was a conflict of evidence as to contributory negligence, and it was submitted to the injury, under proper instructions.
In our opinion, there was no aspect of the case in which the issue of assumption of risk arose. The doctrine is very generally applied that the duty to provide a safe place to work is an absolute duty, which cannot be delegated, and that the breach of this duty is negligence. It is also accepted law that the risks assumed by the employee are the ordinary risks of the employment, and that he does not assume the risk of the employer's negligence.
It would seem to follow, when the jury answers the first issue (105) "Yes," and thereby establishes the negligence of the employer and that this negligence was the real proximate cause of the injury, that there can be no assumption of risk which will prevent a recovery.
It is, however, permissible to consider the knowledge of the employee, his familiarity with conditions, and other circumstances, on the issue employer's negligence. *Page 83 
Upon an examination of the whole record, we find
No error.
Cited: Parker v. Vanderbilt, 159 N.C. 137; Young v. Fiber Co., ib., 382; Pigford v. R. R., 160 N.C. 99; Kizer v. Scales Co., 162 N.C. 136;McNeill v. R. R., 167 N.C. 395; Deligny v. Furniture Co., 170 N.C. 203,204.